THE WARFIELD-PRATT-HOWELL COMPANY, Defendant in Error, *vs.* WILLIAM WILLIAMSON *et al.* Plaintiffs in Error.

*Opinion filed April 23, 1908.*

1. VOLUNTARY ASSOCIATIONS—*when holder of policy issued by voluntary association need not sue each separate member.* Where the membership agreement of a voluntary insurance association provides that the manager shall appear for the subscribers in any suit at law against them on any policy and in their name defend or settle the same, the manager is the agent of all subscribers, and a policy holder may maintain an action at law on the policy against the manager as defendant, and need not sue each subscriber separately for his *pro rata* share of the loss.

2. SAME—*all members need not be made parties to an equitable proceeding.* Where the members of a voluntary association are numerous and it is impracticable to bring them all before the court, service upon a part, to act for the other members of the association as well as for themselves, is sufficient to give a court of equity jurisdiction of the association.

3. EQUITY—*when jurisdiction of equity may be sustained though complainant has a remedy at law.* A court of equity has jurisdiction of a proceeding to enforce payment of a fire policy issued by a voluntary association notwithstanding the complainant has the right to sue at law upon the policy, where the policy is to be paid from a particular fund raised by contributions of the members, which is either in the hands of the manager or to be collected by him, since if it should be necessary to require the manager to perform personal duties in collecting or disbursing the fund the remedies of equity are more efficient than the remedy at law.

4. INSURANCE—*when association is liable for loss.* Where the contract of membership in a voluntary insurance association provides that the manager, when requested by a subscriber, shall at once discontinue underwriting for him, and shall, within thirty days thereafter, cancel all unexpired insurance, a notice from a subscriber of his *intention* to withdraw from the association does not, *ipso facto*, cancel his unexpired policies, and if a loss occurs before the policies expire and before they are canceled by the manager, in accordance with the contract, the association is liable.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. O. E. HEARD, Judge, presiding.

The Warfield-Pratt-Howell Company filed its bill in chancery against William Williamson, the manager, and others, who were the committee of the Merchant Underwriters at the Indemnity Exchange, to recover for a loss occasioned by fire at Sioux City, Iowa, on the 23d day of December, 1904, under six policies of insurance, aggregating $30,000. An answer being filed, the cause was referred to a master to take proofs and report his findings of fact and law thereon. The master made a report sustaining the allegations of the bill and recommending a decree in accordance therewith. Upon a hearing in the circuit court the report and findings of the master were sustained and a decree rendered finding that there was due the complainant the sum of $31,753.78, and directing that the defendants pay the sum out of such funds in their hands as might be available for that purpose. The decree contained an alternative order that in case a sufficient amount of available funds to satisfy the decree were not on hand, the defendants were directed to proceed to collect the same in the manner provided by the subscription agreements of the several persons composing the indemnity company, and when collected to pay the same over to the complainant. The circuit court retained jurisdiction of the cause for the purpose of making any supplementary orders that might be necessary to carry the decree into execution. From this decree an appeal was taken by defendants below to the Appellate Court for the First District, where the decree was in all respects affirmed. Defendants have sued out a writ of error to the Appellate Court for the purpose of bringing the record into review before this court.

The Merchant Underwriters at the Indemnity Exchange (which for convenience will hereinafter be called the indemnity company) is an unincorporated association composed of corporations, firms and individuals, for the purpose of issuing insurance policies to its members on the mutual or profit-sharing plan, so as to obtain indemnity for loss or

damage by fire and lightning at a lower rate than could be obtained from regular commercial insurance companies. Any person, firm or corporation desiring to become a subscriber was required to execute the following agreement:

(*a*)  "The undersigned hereby adopt and agree to the following plan for maintaining an office where policies of fire insurance may be underwritten for the firms, corporations and individuals who have executed or shall execute instruments similar to this, and who are herein called the subscribers.

(*b*)  "The manager's duties shall be to underwrite for the subscribers policies of insurance against loss or damage by fire or lightning; to make cancellations and changes in the amounts and conditions of same; to collect all sums due to subscribers by virtue hereof; to adjust and settle any loss; and to perform such other acts in relation to such policies as the subscribers could themselves do.

(*c*)  "A sum which each subscriber shall deposit shall gauge his interest in the business, in that an amount, not exceeding under any policy such sum deposited, shall be underwritten, severally, for each subscriber. Such deposit, herein denominated subscription, may be of any amount the depositor may elect, if a multiple of $20.

(*d*)  "The committee's duties shall be to supervise the business by adopting proper regulations for the government of the manager (which shall not, however, conflict with any stipulations herein;) to cause all accounts to be examined; to take into their charge and deposit in bank or invest in bonds of the United States, the subscriptions, premiums and other moneys belonging to the subscribers (which moneys the manager shall monthly deposit with the committee;) to pay therefrom such losses as may be determined by the manager as having occurred under policies issued by him; and to pay once, annually, to each subscriber his portion of the earned premiums remaining in their hands and the interest received by them. If, at any time, losses should oc-

cur of any amount sufficient to require for their payment any part of any subscriber's subscription, he shall, upon demand, pay an amount adequate to defray his portion of such losses and leave his subscription intact.

(*e*) "If any subscriber so requests of him in writing, the manager shall at once discontinue further underwriting for him; within thirty days thereafter all unexpired insurance granted for him shall be canceled or re-insured, and he shall be paid by the committee his portion of all funds in their hands. In like manner the manager may, at his discretion, discontinue any subscriber.

(*f*) "The manager may deduct from moneys belonging to each subscriber a sum equal to twenty per cent of all premiums received for that subscriber under policies issued, and in consideration of this percentage he shall defray all expenses incurred for office rents, printing, stationery, postage, telegrams, salaries of deputies and clerks, and all other customary office and business expenses. Charges, if any, on account of adjustments, taxes, counsel fees, inspections and expenses incident to the custody of the funds shall be apportioned *pro rata* among the subscribers.

(*g*) "The manager shall commence and prosecute any proceedings at law in connection with any policy issued by him which he may deem proper, and may compromise, settle or withdraw the same; also appear for the subscribers in case of any proceedings at law being taken against them in connection with any policy, and in their name defend, compromise or settle same.

(*h*) "The undersigned have therefore made, constituted and appointed, and by these presents do make, constitute and appoint, William Williamson, of Chicago, Cook county, Illinois, (referred to herein as the manager,) their true, sufficient and lawful attorney, to act for them, and in their name, place and stead to underwrite policies, and to perform all the other acts referred to herein as duties or privileges of the manager. Such powers may at any time be

deputed by him to another person approved of by the committee, and such deputy shall, in event of the decease or disability of the manager, assume that title and exercise all the powers hereby given to the manager.

(*i*) "The committee, who shall act for the undersigned, as above provided, during each calendar year, shall consist of three or more subscribers, (or members of firms or corporations which are subscribers,) who shall be selected by a majority of the subscribers responding, in writing, to a notification which the manager shall send to all subscribers on the 15th day of each December. The manager shall be a member *ex officio*. Vacancies from any cause may be filled by a vote of the remaining members, likewise the number of members may be increased."

Upon the execution of the foregoing agreement the subscriber would deposit with the managing committee $20 or some multiple thereof, the amount being left to the discretion of the subscriber. Having signed the agreement and made his deposit the subscriber was then entitled to policies of insurance on his property in any amount he might desire, not exceeding, in the aggregate, the total amount deposited by all of the subscribers. In addition to making the deposit the subscriber paid for all insurance written for him at the same rate charged for like insurance by the standard fire insurance companies of the country, less fifteen per cent. An account was opened on the books of the indemnity company with each subscriber, in which he was credited with the amount of his deposit and all premiums paid, less twenty per cent of the latter, which was set apart to defray expenses. The funds thus created in the hands of the indemnity company were invested in United States bonds or deposited in bank at interest. When a loss occurred it was paid from the funds on hand and each subscriber debited with his *pro rata* share thereof. Once each year a balance was struck, and the excess of premiums and interest over current losses for the year was returned to the subscribers

as a dividend or profit. If at any time the premiums and interest on hand were insufficient to pay losses they were paid from the deposits, and each subscriber was then called upon to pay in money enough to restore his deposit account to its original amount. A clear conception of the method of doing business can be had by regarding the indemnity company as a corporation in which the subscribers are the stockholders and the amount deposited by each subscriber is the amount of stock owned by him.

In addition to the method provided in clause (*e*) of the agreement above set out in relation to the withdrawal of subscribers and the cancellation of their insurance, the policies of the indemnity company contained the following clause: "This policy shall be canceled at any time at the request of the insured, or by the attorney giving five days' notice of such cancellation. If this policy shall be canceled as hereinbefore provided, or become void or cease, the premium having been actually paid, the unearned portion shall be returned on the surrender of this policy or last renewal, the attorney retaining the customary short rate, except that when this policy is canceled by the attorney by giving notice, he shall retain only the *pro rata* premium."

Defendant in error is engaged in the wholesale grocery business, with its principal offices at DesMoines, Iowa. It conducted a wholesale grocery business at Cedar Rapids and Sioux City, and also at DesMoines, Iowa. J. W. Howell was secretary of defendant in error and his office was in DesMoines. Each of the houses of defendant in error had a different manager and its business was conducted independently of the other houses. The accounts of the different houses were kept separately and each house had independent charge of insurance matters pertaining thereto, each obtaining insurance and paying the premiums therefor without regard to or directions from the head office at DesMoines. Early in January, 1902, Royal M. Williamson, deputy manager of the indemnity company, called upon the

secretary of defendant in error at DesMoines and solicited the corporation to become a member of the association. After considerable correspondence and a number of personal interviews, on the 24th day of January, 1902, defendant in error executed the agreement above set out and made a deposit of $100 with the indemnity company. Among other things that were gone over by the parties in the preliminary negotiations, the question whether three agreements should be executed,—one for each of defendant in error's houses,—or one agreement for all of them, was discussed. It was finally·determined that one agreement would be sufficient; that each house could make a deposit of its own and take out such insurance as was needed, and separate accounts would be kept by the indemnity company with each house. It was understood that no insurance could be written for either of the branch houses unless a deposit was made by such house and all conditions complied with, except that a separate agreement would not be required for each house. The evidence shows that the accounts were kept separately by the indemnity company and that each house made its subscription deposits and applied for and obtained its own insurance. It is shown that on January 23, 1902, the Des-Moines house deposited $100, on January 24 the Cedar Rapids house deposited $100 and on January 25 the Sioux City house deposited $200, and that on March 5 and May 19, 1902, each of the houses deposited $100 additional, making a total of $300 each for the DesMoines and Cedar Rapids houses and $400 for the Sioux City house. It is shown that each of these deposits was credited on the books of the indemnity company to the respective houses paying the same, together with the amount of premiums paid by each house for the policies issued to it. Thereafter, until December 13, 1904, the business transacted between the indemnity company and the different houses of defendant in error was done directly with the managers of the several houses. During this time numerous policies were written and renewals

made, and premiums and deposits were received from each of the houses of defendant in error.

On December 13, 1904, Howell wrote the indemnity company as follows: "We herewith return to you policy No. 11,849, beginning December 15, 1904, designed to renew our policy expiring on that date, as we do not wish to renew the policy. We also hereby give you notice of our withdrawal from subscription to the Indemnity Exchange. Kindly send us a statement of our account with you." On the next day the indemnity company replied to this letter as follows: "We beg to acknowledge receipt of your favor of the 13th instant, with policy No. 11,849 returned for cancellation, and to state that your account will be liquidated pursuant to the terms of the agreement, following the expiration of the policy."

At the time of the above correspondence the Sioux City house of defendant in error held six policies issued by the indemnity company, the aggregate amount of which was $30,000. The dates of expiration of these policies were in April and October and intermediate months, 1905. On the night of December 23, 1904, the property covered by the Sioux City policies was totally destroyed by fire. It is admitted that the loss largely exceeded the amount of insurance. On December 24 the defendant in error telegraphed from Sioux City notice of its loss, and on January 8, 1905, furnished the plaintiffs in error with formal proofs of loss. After the receipt of the telegram notifying plaintiffs in error of the loss, the latter, claiming that the letter of defendant in error written on the 13th of December had the effect of canceling all the policies held by defendant in error, denied liability, made up a statement of defendant in error's account and enclosed a check for $571.89. This check was returned to plaintiffs in error with a request for an adjustment and payment of the loss.

Plaintiffs in error contend that the decree of the circuit court, and the judgment of the Appellate Court affirming

the same, should be reversed because a court of equity has
no jurisdiction of the cause for the reason that the remedy
at law is complete and adequate; that defendant in error
has no cause of action, either at law or in equity, for the
reason that the policies had been canceled and were there-
fore not in force at the time of the loss.

BARGER & HICKS, for plaintiffs in error.

THOMAS BATES, and GEORGE C. FRY, for defendant in
error.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Plaintiffs in error first contend that even if the policies
were in full force at the time of the loss, defendant in error
should have brought a separate action at law against each
of the five or six hundred subscribers for the *pro rata* share
that each was liable to contribute to pay this loss. To this
contention there is more than one sufficient answer. In the
first place, the language as well as the spirit of clause (*g*)
in the agreement shows plainly that the subscribers did not
contemplate that. they would be required to bring five or
six hundred suits at law in order to collect for a loss, or
that they would be called upon to individually defend suits
that might be brought against them by other subscribers
for losses. The hardship and annoyance which such a rule
would impose on subscribers would deter them from be-
coming members of such an association and render the or-
ganization of associations of this character impracticable.
The agreement provides that the manager shall "appear for
the subscribers in case of any proceedings at law being taken
against them in connection with any policy, and in their
name defend, compromise or settle the same." It is also
the duty of the manager to collect all sums due the subscrib-
ers by virtue of their agreements, and it is equally his duty
to adjust and settle all losses out of the funds paid to him
for that. purpose. It is not disputed that at the time this

bill was filed there were ample means on hand to pay this loss without calling upon the subscribers for contribution. It thus appears that by the very terms of the agreement itself the manager was authorized to represent all of the subscribers in any litigation that might be brought in which they were mutually concerned. The agreement clearly constituted the manager the agent of all the subscribers, to represent them, both in and out of court, in the settlement of any litigation or other difference that might arise. A suit against the manager in his representative capacity is, in effect, a suit against the subscribers, and a judgment or decree against him will bind them to the extent that they are liable to contribute toward its payment. We are clearly of the opinion that the manager represents all the subscribers, and that a judgment against him in an action at law or a decree in an action in equity is binding upon the indemnity company.

If there were no express clause in the agreement authorizing the manager to appear for and represent all the subscribers in litigation against the members, it would still not be necessary, in an equitable proceeding against the association, to make all of its members parties and serve them with process. In such case the rule that all persons interested in the subject matter in controversy should be made parties would not apply, but the case would be controlled by an exception to that rule, that where the parties are numerous and it is impracticable to bring them all before the court, service upon a part, to act for the other members of the association as well as for themselves, will be a sufficient service upon the whole. (*Guilfoil* v. *Arthur,* 158 Ill. 600; *Fitzpatrick* v. *Rutter,* 160 id. 282; Story's Eq. Pl. sec. 111.) There are many cases to be found where suits in equity have been sustained against voluntary unincorporated associations where service was had upon some agent, committee, manager or trustee, who in some sense might be said to represent the body of the membership.

In view of the fact that the manager in the case at bar is expressly authorized and empowered to represent the subscribers in all litigation that may arise in relation to any policy, we do not think that the jurisdiction of a court of equity can be sustained on the ground that it will prevent a mutiplicity of suits at law, since, as already pointed out, a multiplicity of suits is obviated by the express terms of the agreement.

Plaintiffs in error seek to maintain the proposition that since the relation of the parties, as well as the relief sought, is purely legal, equity has no jurisdiction. Defendent in error seeks to uphold the jurisdiction of equity on the ground that the case falls within the exclusive jurisdiction of a court of equity. Neither of these contentions is sound. In our opinion the case belongs to that class where both the primary rights and the relief sought are purely legal and therefore cognizable in a court of law, but of which a court of equity will take jurisdiction on the ground that, owing to the methods of procedure and the means available to carry its decrees into execution, its remedies are more adequate, complete and prompt than those afforded by a court of law. Defendant in error in the case at bar is the holder of six policies of insurance on which it claims a liability against plaintiffs in error on account of the loss of its goods by fire. There is nothing in the character of the rights or in the ultimate relief sought that distinguishes this case from any other claim under an insurance policy for loss. It would be a very unusual state of facts if one holding a fire insurance policy could not maintain an action at law thereon to recover for a loss. We see no reason for holding that the policies involved in this suit might not be sued on in a court of law. It does not follow, however, that because the case is one in which a remedy at law is afforded, equity will not also take jurisdiction of the same state of facts to afford the same redress. If the remedy in equity is more adequate because of some special circumstance of the situ-

ation, the jurisdiction of equity will be sustained. In the case at bar the ultimate relief sought is the satisfaction of a legal demand, but this demand is to be paid out of a particular fund created or to be created by contributions made by a large number of persons, which is either in the hands of the manager or is to be collected by him from the subscribers. It may become necessary, before the decree is satisfied, to require the manager to perform some or all of the personal duties which he has assumed in respect to the collection and disbursement of the funds of the indemnity company. If so, the procedure in courts of equity is peculiarly well adapted to enforce the performance of any personal act required of plaintiffs in error in order to obtain satisfaction of the decree. One of the oldest maxims of equity is that it acts *in personam*—not *in rem*. A decree in chancery speaks in words of command to the defendant, but to carry it into effect some personal act of the defendant is required. For instance, equity determines that one party is the owner of the equitable title to land and decrees that a conveyance shall be made by the holder of the legal title thereof. Such a decree does not, *ex proprio vigore,* vest the title. The personal act of the defendant, or some one for him, in making the conveyance is necessary to carry the decree into effect. (1 Pom. sec. 428, *et seq.*) A court of equity has all the powers of a law court to enforce its decrees by an execution against the property of the defendant. In addition to the usual process of execution against the goods, chattels, lands and tenements of the defendant, a court of equity may, if necessary, attach the defendant and enforce a compliance with its decree by fine or imprisonment,—one or both,—or may direct a sequestration for disobedience to its decrees. (Hurd's Stat. 1905, chap. 22, sec. 47.) By the flexibility of its procedure and the scope of remedies it is authorized to employ to secure satisfaction of its decrees, courts of equity are peculiarly well equipped to furnish complete and adequate relief in cases of this character. There is a legal

obligation at the foundation of the suit, but difficulties may
arise out of the manner in which the obligation rests upon
the persons or property of plaintiffs in error or in the ef-
ficiency of the process belonging to the law court which
makes the legal remedy inadequate. (*Wylie* v. *Coxe,* 15
How. 416; *Barber* v. *Barber,* 21 id. 582.) In *Weymouth*
v. *Boyer,* 1 Ves. Jr. 416, Mr. Justice Buller says: "We
have the authority of Lord Hardwicke that if a case was
doubtful or the remedy at law difficult we would not pro-
nounce against the equity jurisdiction. This same principle
has been laid down by Lord Bathurst." (See *Society of
Shakers* v. *Watson,* 68 Fed. Rep. 630.) We have no doubt
of the jurisdiction of a court of equity under the facts dis-
closed here.

Plaintiffs in error insist that the policies sued on were
canceled by the letter of defendant in error written Decem-
ber 13, 1904. This contention cannot be sustained. Even
if the letter relied on as effecting a cancellation is consid-
ered applicable to the policies issued to the Sioux City
house, still such letter would not, *ipso facto,* cancel the poli-
cies, but would only work a cancellation at the expiration
of thirty days, or prior to that time in case plaintiffs in
error re-insured the risks or returned the premium and took
up the policies. It is also to be noted that the letter of De-
cember 13 was only a notice of an intention to withdraw
from the subscribership to the Indemnity Exchange. There
was nothing said in the letter in regard to the cancellation
of the policies. Policy No. 11,849, which was returned with
the letter, was a policy designed as a renewal of a policy
expiring on that date. This policy was never, in fact, in
force, and if it had been it had nothing to do with the
Sioux City property. The notice of an intention to with-
draw as a subscriber would not, in and of itself, terminate
unexpired policies. Under clause (*f*) of the agreement the
manager, when requested by the subscriber, would at once
discontinue further underwriting for him, and within thirty

days thereafter it is provided all unexpired insurance shall be canceled or re-insured and the subscriber shall be paid by the committee his portion of all funds in their hands. After the receipt of the letter of December 13 nothing whatever was done by the plaintiffs in error until after the fire, when they sought to treat the policies as canceled. The occurrence of the fire fixed the liability of plaintiffs in error, and it was too late then to attempt to treat the policies as having been canceled on the 13th.

Finding no error in the record the judgment of the Appellate Court for the First District is affirmed.

*Judgment affirmed.*