THE PARKHURST-DAVIS MERCANTILE COMPANY, Appellee, *vs.* THE MERCHANT UNDERWRITERS AT THE INDEMNITY EXCHANGE *et al.* Appellants.

*Opinion filed December 15, 1908—Rehearing denied Feb. 4, 1909.*

1. EQUITY—*when equity may take jurisdiction though action at law could be brought.* A court of equity may take jurisdiction of a suit against an underwriters' association, its manager and certain members, to enforce payment of insurance policies, and may grant relief even though an action at law could be brought, since the remedy in equity is more adequate and better adapted to secure performance of any personal act which may be required of the manager or committee of the underwriters. (*Warfield-Pratt-Howell Co.* v. *Williamson,* 233 Ill. 487, followed.)

2. INSURANCE—*when policies are not void for fraud.* Renewal policies sent by the insurer to the insured without any application or representation by the insured and upon the same terms as the original policy, which was based upon a special contract as to the rate and not upon any system of discount from the prevailing board rate, are not void for failure of the insured to give information as to insurance rates, asked for in the letters enclosing the renewal policies, since if an insurer deems such information material it should insist upon an answer or cancel the policies.

3. SAME—*policy construed as to meaning of term "concurrent insurance."* Under the rule that where a provision of an insurance policy is ambiguous and susceptible of more than one construction that construction will be adopted which is most favorable to the insured, a provision of a fire policy reading, "$150,000 total concurrent insurance permitted," will be construed as permitting other insurance, concurring with that of the policy in question, to the amount of $150,000.

4. SAME—*when compromise of suit against water company is no defense to suit on policy.* In order that a compromise of a suit against a water company shall operate to discharge a fire insurance company from liability upon the ground that subrogation was thereby prevented, the insurer must prove that a liability on the part of the water company existed; but if the insured acted in good faith and the compromise was made for the benefit of all the insurance companies interested, by attorneys acting for them, the compromise presents no defense to a suit on the policy, even if the water company was liable.

APPEAL from the Appellate Court for the First District;—heard in that court on writ of error to the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

BARGER & HICKS, for appellants.

FREDERICK A. BROWN, WILLIAM F. SCHOCH, LEE MONROE, and GEORGE A. KLINE, for appellee.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

The Merchant Underwriters at the Indemnity Exchange, an association engaged in insuring its subscribers or members against loss or damage by fire or lightning and doing business in the city of Chicago, issued two policies of insurance to the Parkhurst-Davis Mercantile Company, a corporation of the State of Kansas, on its wholesale grocery stock in the city of Topeka,—one for $10,000 and the other for $20,000. On February 13, 1904, while the policies were in force, the property insured was burned, and the Underwriters having refused to pay the amount of the

policies, the mercantile company filed its bill in equity in the superior court of Cook county against the Underwriters and the manager and a number of members to enforce payment. The nature of the business carried on by the Underwriters and the agreement executed by subscribers were explained at length in the case of *Warfield-Pratt-Howell Co. v. Williamson,* 233 Ill. 487, and need not be repeated here. The defenses interposed by answer to the bill were, first, that the rate of premium to be paid was to be fifteen per cent less than the rate at which the complainant's other insurance was written, and the complainant falsely represented that it was obtaining its other insurance at a much less rate than it was, in fact, paying, and thereby induced the managers of the Underwriters to issue the policies at a less premium rate than otherwise would have been charged; second, that the policies were to be void if the insured had other insurance on the property exceeding $150,000, including these policies, and at the time the fire occurred there was insurance on the property amounting to $160,000; third, that the complainant, by releasing the receiver of a water company from liability for the loss, released and discharged the Underwriters. Another defense not set up by the answer is that the complainant had a complete and adequate remedy at law, and for such reason could not maintain the suit. Upon a hearing the court found the equities for the complainant and entered a decree in its favor for $32,512.50, together with costs, and ordered the committee of the Underwriters to pay the same out of funds on hand. The defendants sued out a writ of error from the Appellate Court for the First District, and that court affirmed the decree. From the judgment of the Appellate Court this appeal was prosecuted.

The defendants demurred to the bill, alleging as one ground of their demurrers that the complainant had an adequate remedy at law, but when the demurrers were overruled they did not stand by them. They answered on the

merits, without setting up the claim that the complainant had an adequate remedy at law. But if the question whether a court of equity could grant the relief sought by the bill is proper to be considered, it is answered by the decision in *Warfield-Pratt-Howell Co. v. Williamson, supra.* It was there held that although an action at law could be brought, a court of equity would take jurisdiction on the same facts and grant relief because of the special circumstances of the situation and because the remedy in equity is more adequate, the procedure in courts of equity being peculiarly adapted to enforce the performance of any personal act required of the manager or committee in order to obtain satisfaction of the decree.

The first defense on the merits alleged in the answer and now insisted upon is, that the policies were void because of the fraudulent practices of the complainant in concealing from the manager of the Underwriters the rates paid by it to other insurers on the same risk. Probably the usual method of insurance by the Underwriters was to fix a premium rate fifteen per cent less than other insurance companies. But that was not the contract with the complainant. There is nothing of that kind in either policy, nor anything from which it could be inferred that the rate was fixed with reference to the rate paid for other insurance. It is stated below the signature that when a request for insurance is made the subscriber should inform the manager what the insurance companies' rates are, and where the insurance companies' rates vary, the highest prevailing rate is to be given. Endorsed on the back of each policy is an amount purporting to be a premium, with a deduction which in fact appears to be fifteen per cent, but there is nothing in the nature of a contract on the subject. The insurance was renewed at different times, and the agent of the Underwriters who called on the president of complainant and secured the first insurance, offered to write the business on the basis of the board rate, with fifteen per cent off. He

was told that the board rate was eighty-five cents, and he could not write the insurance on the terms which he proposed. He then offered to make a flat rate of seventy-five cents less fifteen per cent, and that offer was accepted, and the first policy was issued in October, 1901, for $20,000. In June, 1902, another policy for $10,000 was issued on the same risk and at the same rate, not based on the cost of other insurance at all. No request was ever made for any renewal of the policies, but new policies were sent to the complainant from time to time, about two weeks before the expiration of the existing policy. One of these policies was sent to the complainant on October 13, 1902, renewing the insurance for one year. On May 29, 1903, another policy was sent renewing the one for $10,000, which would expire June 15, 1903. On October 13, 1903, another policy in renewal of the one for $20,000 was sent to the complainant. The policies of May 29, 1903, and October 13, 1903, were the policies in force at the time of the fire, and they were sent to the complainant by the Underwriters without any application or representation and on the same terms as the previous policies. There was a postscript to each of the letters enclosing renewal policies relating to or calling for information as to the insurance companies' rates, but there was no answer to either of them, and the Underwriters neither canceled the policies nor demanded the information. The agent who first took the insurance could have easily ascertained the board rate or the rates of other insurance companies, and the Underwriters could have learned at any time what they were. As the insurance of the complainant was not based on the alleged system or practice but upon a special contract, and the subsequent policies were mere renewals of the first, they were not void because of a failure to answer the questions or give the information. If the Underwriters considered the information material or ground for canceling the policies, the proper course would

have been to have insisted on an answer or canceled the policies.

Each policy provided that it should·be void, unless otherwise provided by agreement endorsed thereon or added thereto, if the insured had other insurance on the property, and each policy contained the following: "$150,000 total concurrent insurance permitted." The complainant had insurance aggregating, with these two policies, $160,000, but did not have other insurance beyond the amount specified if they were excluded. The controversy over the language quoted is whether concurrent insurance means insurance including the policies in question or other insurance concurring with it. Concurrent, as used in the policies, means running with, and it would not be a strained or unnatural construction to say that the parties meant $150,000 of other insurance running with these policies. There is evidence tending to show that the parties so understood the meaning of the permission given. After the loss occurred and proofs were called for, the complainant furnished to the Underwriters a list of the policies, amounting in all to $160,000, and there was a notation on the bottom of that list of the board rate at $1.05. On March 26, 1904, the manager wrote the complainant that he had received the list of companies and noted that the board rate was $1.05, making that a ground of objection but saying nothing about the other insurance exceeding the limit. No objection on that ground was made at the time or for a long time afterward, and the inference would be that the Underwriters understood the provision as to concurrent insurance the same as the complainant. The most that can be said of the provision is that it was ambiguous, and being equally susceptible of more than one construction, that one must be adopted which is most favorable to the insured. It would have been a very easy matter to have made the provision perfectly clear and definite, and in view of the rules of construction we interpret the provision as permitting other

237 — 32

insurance concurring with that of the underwriters to the amount of $150,000.

The third ground of the defense is that the complainant released the Topeka Water Company and its receiver from liability for the loss, and thereby discharged the Underwriters by preventing subrogation. The water company was in the hands of a receiver, and the insurance companies employed attorneys who filed an intervening petition in the name of the complainant in the receivership proceeding, alleging that the loss occurred by reason of the fault and negligence of the water company. An agreement was entered into on April 21, 1904, between the attorneys acting for the insurance companies and the complainant, by which the several insurance companies were to be entitled to such an amount as the amount of insurance paid by them should bear to the whole amount of the loss, and they should each pay the costs of the litigation on the same basis. The attorneys compromised the claim, and the proportion of the moneys received to which the Underwriters would be entitled on payment of their policies was reserved for that association. The complainant acted in perfect good faith and the compromise was made by attorneys acting for all the insurance companies, so that the defense could not avail if there had been a liability of the water company. It was necessary for the defendants to prove that such a liability existed, and this they failed to do. The evidence showed that whatever fault or neglect there may have been on the part of the water company in furnishing an insufficient supply of water or insufficient pressure, the property could not have been saved if there had been no such negligence.

We conclude that the decree of the superior court was in accordance with the equities of the parties and that the Appellate Court did not err in affirming it.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*