THOMAS CANNING CO. *v.* CANNERS EXCHANGE SUB-
SCRIBERS AT WARNER INTER-
INSURANCE BUREAU.

1. Insurance — Mutual Insurance Associations — Doing Busi-
ness in State—Statutes.

Where an association composed of individuals, partner-
ships, and corporations, engaged in the canning business,
gave power of attorney to one W., incorporated, for the
purpose of writing reciprocal or inter-insurance against
loss by fire, and qualified under 2 Comp. Laws 1915, §
9246 *et seq.,* to carry on such co-operative system of in-
surance in this State, and solicits applications from sub-
scribers for insurance on property within the State and
issues and delivers policies, adjusts and pays losses, etc.,
it is doing business in this State regardless of the fact
that its headquarters and office are out of the State
and whether its policies are to be construed as contracts
made in this or another State.

2. Same—Voluntary Associations—Liability of Association.

In view of the co-operation of the subscribers for a com-
mon purpose, acting together for the promotion and ac-
complishment of an object of mutual advantage through
a selected agent common to all, it is *held,* to be a voluntary
association liable in an action at law for a loss by one
of its members, notwithstanding an agreement among
themselves that there will be no joint liability, but that
each shall be only severally holden for his proportion
according to his relative amount of insurance.

3. Same—Method of Enforcing Liability of Association.

The method of enforcing the liability of the individual
subscriber, so long as each subscriber is not holden in
excess of his individual proportionate liability, is in
principle but a procedural matter over which the legis-
lature of each State has control within the constitutional
limit against impairing the validity of contracts.

4. Same—Right of Action Against Association.

Under the law and facts presented by this record, *held,*

that where a member has sustained a loss his rights are purely legal, and that, under the fair intendment of our statute, an action at law against defendant in the associate character and name by which it contracted will lie.

5. SAME—FOREIGN CONTRACTS.
Since defendant's office is in the State of Illinois, from which its policies are issued, they are to be regarded as Illinois contracts and construed under the laws of that State.

6. SAME—PROPORTIONATE INSURANCE—MEASURE OF LIABILITY.
In determining defendant's liability under its policy containing a clause that its subscribers should not be "liable in the aggregate under this policy for a greater proportion of any loss on the described property * * * than the amount hereby insured shall bear to the whole insurance, whether valid or not," the trial court properly followed the decisions of the Illinois courts holding that the other old line insurance was concurrent, and defendant's liability was to be measured by the terms of its own policy.

Error to superior court of Grand Rapids; Brown (William B.), J., presiding.    Submitted October 18, 1921.    (Docket No. 134.)    Decided July 20, 1922. Rehearing denied November 2, 1922.

Assumpsit by the Thomas Canning Company against the Canners Exchange Subscribers at Warner Inter-Insurance Bureau on certain policies of insurance.    Judgment for plaintiff.    Plaintiff and defendant bring error.    Affirmed.

*Colin P. Campbell* (*Henry C. Walters,* of counsel), for plaintiff.

*Knappen, Uhl & Bryant* and *John M. Zane, Charles F. Morse* and *Thomas L. Marshall,* for defendant.

STEERE, J.    Plaintiff is a Michigan corporation located at Grand Rapids, engaged in the canning business.    It brought this action in the superior court

of Grand Rapids on certain insurance policies issued to it by defendant, which is an association composed of individuals, partnerships and corporations engaged in the canning business authorized to insure its members under a scheme by which they gave power of attorney to one Lansing B. Warner, Incorporated, for the purpose of writing reciprocal or inter-insurance against loss by fire. The headquarters of the association is at Warner Inter-Insurance Bureau, with Lansing B. Warner, Incorporated, as its attorney and tangible representative, located in Chicago, Illinois.

At and before the time of the events in controversy here defendant had been licensed to issue, or exchange, reciprocal or inter-insurance policies in this State under Act No. 278, Pub. Acts 1913 (2 Comp. Laws 1915, § 9246 *et seq.*), which provides that under specified conditions and restrictions "Individuals, partnerships and corporations of this State, hereby designated subscribers," may on application to the State commissioner of insurance and compliance with all requirements of the act be authorized to do business in this State through a designated attorney, who is required to annually procure from the insurance commissioner a certificate of authority to act for and represent the organization and to make annual reports to him, but who is not "required to furnish the names and addresses of any subscribers, nor the loss ratio."

Defendant qualified to do business in this State and issued its insurance policies under the name "Canners Exchange Subscribers at Warner Inter-Insurance Bureau, by Lansing B. Warner, Incorporated, Attorney." During the years 1915-16 defendant issued to plaintiff 11 policies insuring its plant and stock at Grand Rapids, Michigan, to the amount of $75,000. Seven were placed on buildings and machinery and four covered stock. The policies were all in force on July 31, 1915, when a fire broke out in plaintiff's

plant destroying a portion of its buildings, machinery and stock on hand. Plaintiff also had other insurance on this property in old line companies. The total insurance on buildings and machinery was $89,500, of which defendant had $57,000. The total insurance on stock in all parts of the plant was $95,800, of which defendant carried $18,000.

Notice of the loss was promptly given to defendant and other insurers. Defendant acknowledged the notice and later sent its adjuster, John E. Matthews, to Grand Rapids who, with Frank E. Row, an adjuster for the other insurers, made such examination of the premises, result of the fire, plaintiff's accounts, bills, books, etc., as they desired. Plaintiff claims they then took up and went over the various items of loss with its president, Mr. Thomas, and arrived at an adjustment of said loss, in concluding which Matthews said: "Yes, go ahead and clean it up, it is all settled," they having then agreed on the following estimate and figures:

"Value of building and machinery, $104,551.49; damage to buildings and machinery, $14,459.14; value of all stock, $89,499.59; damage to stock, $36,349.39; total loss and damage, $50,803.54."

This defendant denies, with the further contention that if any adjustment was then agreed upon or approximated it was the result of deceit and false representations by plaintiff's president, or other representatives, and void because fraudulently induced. Thereafter proofs of loss were timely furnished to defendant and other insurers based on the adjustment claimed to have been agreed upon. All the insurers but defendant paid their proportion. Defendant called for further proofs of loss, which were furnished, but eventually denied liability and this action followed.

Service of process was had on the insurance commissioner, as the act authorizes and makes "valid and

binding upon all subscribers exchanging at any time reciprocal or inter-insurance contracts through said attorney." Plaintiff declared against defendant by name, and "Lansing B. Warner, Incorporated, George G. Bailey, Frank Van Camp, George N. Numsen, L. A. Sears, William R. Roach and Lansing B. Warner, committee." Defendants appeared by counsel and pleaded the general issue as follows:

"Now comes the defendants, the persons, firms and corporations who, on July 31, 1917, were Canners Exchange subscribers at Warner Inter-Insurance Bureau, and Lansing B. Warner, Incorporated, attorney, and demand a trial of the matters set forth in plaintiff's declaration."

Under this plea notices of special defenses, 16 paragraphs in number and covering 7 pages of the printed record, were given, amply covering all points urged for the defense in the court below and here. Of those most prominent upon the trial, the legal contention is made—

"That the proper remedy of plaintiff is by suit in equity to establish its claim for an accounting as between the various subscribers, if the plaintiff shall establish its claim."

And on the issues of fact to which the testimony in this ample record is largely devoted notice is given that "plaintiff has been guilty of fraud, false swearing and fraudulent concealment with reference to each of the several policies" sued upon, in various particulars detailed from "*a*" to "*k*." During the progress of the trial all of defendants' rights to review were timely protected by abundant motions and objections unnecessary to detail at length.

Defendant's request for a directed verdict on various grounds was tentatively denied and the court took the verdict of the jury under the Empson act (3 Comp. Laws 1915, § 14568 *et seq.*) on the two questions of

whether there was any adjustment of loss, in which the minds of the parties met as to the amount of the loss sustained by plaintiff because of this fire covered by the insurance policies in question; and, if so, was there any fraud, deceit or misrepresentation on the part of plaintiff influencing the agreement.   Instructions at length were given the jury on those propositions, with positive directions that if plaintiff had failed to show an adjustment by a preponderance of evidence, or if fraud tainted any adjustment shown there could be no recovery.

The court also instructed the jury that if they found from the evidence there was an award as plaintiff claimed, without misrepresentation or fraud, and reached the question of damages, then on the basis of the claimed award their verdict should be $18,911.98, being 570/895's of the total loss on buildings, and 180/958's of total loss on stock.   The jury rendered a verdict for that amount, and answered two special questions submitted at request of counsel as follows:

"Was an adjustment of the amount of the loss, $50,803.54, made by Matthews, Row and Thomas?
"Yes.
"Was such adjustment brought about by the fraud of the plaintiff or any of its officers, or employees through fraudulent misrepresentation of the value, cost and quantity of the property destroyed?
"No."

Plaintiff's counsel thereafter moved for a judgment *non obstante* in the sum of $30,360.20 on its claimed basis of apportionment, and defendant's counsel for a judgment of no cause of action.   These motions were denied and judgment entered on the verdict as rendered.   From that judgment both parties appeal for review by writ of error.

Plaintiff's assignments of error are directed to the apportionment adopted by the court, and its refusal to enter judgment *non obstante* for $30,360.20 on the

special verdict of the jury. Defendant's 57 assign-
ments of error gave range for full argument of its
numerous contentions, condensed in counsel's brief to
the following propositions:

"(1) The judgment cannot stand.
"(2) The lower court laid down an improper rule
as to false swearing in the proofs of loss.
"(3) The plaintiff's scheme of apportionment is
wholly untenable."

Of the numerous questions raised in this contro-
versy the first naturally demanding consideration is
defendant's contention that an action at law to collect
the loss sustained from destruction by fire of property
insured under one of defendant's policies will not lie.
We are favored with scholarly briefs by defendant's
counsel pointing out that defendant's policies are for
inter-insurance, an old and well known plan or
system of co-operative indemnity whereby several
individuals, firms and corporations underwrite each
other's risks against loss by fire or other hazards,
through an attorney in fact common to all, pursuant
to an agreement that each underwriter acts separately
and severally, and not jointly with any other. Coun-
sel point out that this oldest form of insurance grew
out of the maritime laws of the ancient Rhodians and
entertainingly dwells upon its history and develop-
ment to the present time, somewhat along the lines
found in appended notes to section 336a of Joyce on
Insurance (vol. 1, 2d Ed.), and a discussion of the
subject in 58 Cent. Law Journal, p. 323, which point
out that, although sufficiently analogous in certain
particulars to sometimes mislead, this system is dis-
tinguishable from Individual Insurance, Lloyd's In-
surance, General Partnership Insurance, Limited In-
surance, Mutual Insurance, and various other systems
of insurance which the ingenuity of man has devised.
While substantial characteristics are instructively ex-

plained, controversies over names, distinctions and immunities of organizations claimed to be of that class have at times resulted in a confusing war of words and definitions carried to a technical nicety throwing little light on the substantial merits of the controversy.

It is also urged for defendant that there was no coming by it into the State to do business because its headquarters and office are in Chicago, where its business is conducted, applications for insurance received and policies issued, and its contracts for insurance are not made in this State.

By whatever methods or words it may be differentiated defendant's system of co-operative indemnity is insurance.   To that end its subscribers, or members, have in combination adopted a distinguishing name, and appointed Lansing B. Warner, Incorporated, as attorney in fact of each, but common to all, for the purpose of carrying on their system of insurance under that name.   Detailed authority is given this attorney to exchange insurance among subscribers, execute and deliver to them "policies of insurance containing such terms and conditions as the attorney shall deem proper," to subscribe defendant's adopted name to such policies, collect moneys due under them, compromise and settle losses, bring or defend suits, adjust and settle them, appoint an agent upon whom service of process may be had in any State where such appointment is or may be necessary, and in general to do any act proper and necessary to fully carry out the power conferred, including the acknowledgment and delivery of papers.   Certain limitations on such power are specified, amongst which it is expressly provided that no policy of insurance shall be issued whereby the insured may become jointly liable in any manner for performance of any contract of any other subscriber, or bind him or it "otherwise than to a several, individual liability,"

which shall be "only such proportionate share of the insurance granted by such policy" as the total of "the reserve fund deposit" of the subscriber bears to the total reserve deposit of all other subscribers.

In the name adopted by "such subscribers contracting among themselves" they have, through their attorney, qualified to carry on their co-operative system of insurance in this State. To the extent the attorney directly or through authorized agents operates in this State by soliciting applications from subscribers for insurance on property within the State, inspects and appraises such property for that purpose, issues and delivers policies, investigates and pays or adjusts losses through its representative adjuster, or engages in that connection in other insurance activities, it is doing business in this State regardless of whether the policies it issues are to be construed as contracts made in this or another state. *Seamans* v. *Temple Co.*, 105 Mich. 400 (28 L. R. A. 430, 55 Am. St. Rep. 457).

Defendant's strongest ground urged for immunity from actions at law is that no outsider is involved and the contract under which plaintiff seeks relief is between himself and those exchanging insurance with him, expressly agreeing each with the others that there will be no joint liability, but each shall be only severally holden for his proportion according to his relative amount of insurance, thus bringing the case under the general rule that parties severally liable for different items of a total demand may not be made joint defendants in an action at law to recover the combined amount of their various individual obligations.

At conclusion of the evidence a motion of defendant's counsel to dismiss the action as to defendants "Lansing B. Warner, Incorporated, and as attorney" was granted without opposition. Plaintiff's counsel

contend that as the case was submitted to the jury and judgment entered on the verdict it was not an action or judgment against the subscribers as such, jointly or severally, but against the entity of the organization as an unincorporated voluntary association with a distinguishing name by which actions at law or in chancery may be brought against it as provided in section 12363, 3 Comp. Laws 1915. Direct appeal to that act for authority is embarrassed, however, by the fact it relates to such associations "formed in this State," and said Act No. 278 under which defendant operates in this State concludes (§ 12) that "Except as herein provided no law of this State shall apply to the exchange of such indemnity contracts." But Act No. 278 also provides in section 4 that as condition of authority to operate under it defendant's authorized attorney shall file with the State commissioner of insurance an instrument in writing executed in behalf of the subscribers providing that service of process may be had upon said commissioner of insurance "in all suits in this State arising out of such policies * * * which service shall be valid and binding upon all subscribers exchanging at any time reciprocal or inter-insurance contracts through such attorney."

Under the power of attorney to be signed by each subscriber, but in form and attorney designated common to all, provision is made for collecting, caring for and disbursing an "expense and guarantee fund," a "reserve fund" and a "surplus reserve." Of the former it is said in section 3:

"No premiums shall be charged for any policy of insurance the consideration being the exchange of indemnity, but the undersigned will deposit with the attorney at the time each policy is issued to the undersigned, such a sum as the attorney shall deem proper, to be designated 'Expense and Guarantee Fund,' and to be held and disposed of as hereinafter provided."

The subscriber is required to deposit at request of the attorney not less than $10 in the reserve fund and at his option increase the deposit to an amount not exceeding an average of $2 for each full $1,000 of insurance he carries.

By section 5 the attorney is allowed and authorized to retain 20% of the total expense and guarantee fund collected, out of which he is required to pay the expenses incident to the execution of his duties—

"—except the payment of losses, expenses incident to the adjustment and settlement of losses (other than adjuster's fees and expenses), counsel fees, costs and expenses and assessments, license fees, expenses of litigation, taxes, legal expenses and assessments, expenses of fire patrol, fees and expenses of the advisory committee and expenses incident to the investment and custody of funds and securities."

To maintain the reserve, section 7 provides that in case the reserve deposit provided for is reduced or encroached upon the subscriber must immediately restore the same by deposit of the proper amount with the attorney in fact "and the attorney is hereby authorized and empowered to enforce such deposit by suit brought in the name of the attorney or otherwise."

Further in the direction of concerted action and central control by chosen authority, and "for the purpose of protecting the rights of all parties in interest," section 10 provides for the election by subscribers of an advisory committee consisting of five members "and the president of the attorney, who shall be *ex officio* a member and act as secretary of the committee." This committee is given "power to adopt such rules and regulations, not inconsistent herewith, as they shall deem proper for calling and holding their meetings, and for carrying into effect the terms and provisions hereof" and to fill any vacancies in their membership caused by one of them ceasing to be a subscriber, etc. The lengthy section concludes:

"The advisory board shall take into their own charge and keeping all moneys or securities received by the attorney on account of the subscribers; less such sums as the attorney is authorized to deduct, and shall have full direction in regard to the investment and safe keeping of such moneys and securities.   The advisory committee shall pay out of any funds on hand, from time to time, all losses adjusted and settled by the attorney, and all other expenses not herein provided to be paid by the attorney. · Disbursements shall be by voucher check approved by the attorney and signed by at least two members of the advisory committee, to be designated for that purpose by a majority of the committee."

On the subject of an available reserve section 6 of said Act No. 278 requires as follows:

"SEC. 6. There shall at all times be maintained as a reserve, a sum in cash or convertible securities equal to fifty per cent. of the net annual deposits collected and credited to the accounts of the subscribers on policies having one year or less to run and *pro rata* on those for longer periods.   Net annual deposits shall be construed to mean the advance payments of subscribers after deducting therefrom the amounts specifically provided in the subscriber's agreements, for expenses.   Said sum shall at no time be less than twenty-five thousand dollars, and if at any time fifty per cent. of the deposits so collected and credited shall not equal that amount, then the subscribers, or their attorney for them, shall make up any deficiency."

Mr. Lansing B. Warner, called under the statute by plaintiff, testified that the aggregate on hand of the several funds named amounted to $396,639.22 on July 31, 1916, which was deposited in several banks and trust companies in Chicago, standing on their books in the name of the Canners Exchange Subscribers at Warner Inter-Insurance Bureau subject to check, and that "all checks must be signed by two members of the advisory committee that are elected by a majority of the committee for that purpose, on vouchers ap-

proved by Lansing B. Warner, Incorporated." Under the requirements in the power of attorney and said Act No. 278, together with the evidence of how their business was conducted, it may fairly be assumed there were funds on hand available to pay this loss without directly demanding further deposits from subscribers for that specific purpose. Upon the subject of unadjusted losses Warner said,—

. "We have a reserve for unadjusted losses. I don't believe we had such a fund as that on July 31, 1916. We carried such a fund from time to time when occasion required; if we did not have any unadjusted losses we didn't have any such fund. If we had there would be."

In view of the co-operation of these subscribers for a common purpose with the methods adopted and followed to accomplish it as before outlined, we are not persuaded by defendant's insistence that the Canners Exchange Subscribers is not a voluntary association. They voluntarily act together for the promotion and accomplishment of an object of mutual advantage through a selected agent common to all instead of the more common method by corporate organization, or a partnership in which they would necessarily be agents for one another.

Though differences in detail can be pointed out, conditions similar in principle to those involved here were dealt with in *Warfield-Pratt-Howell Co.* v. *Williamson*, 233 Ill. 487 (84 N. E. 706); *Mountain Timber Co.* v. *Underwriters*, 98 Wash. 167 (167 Pac. 93); *Lewelling* v. *Underwriters*, 140 Ark. 124 (215 S. W. 258); *Merchants & Mf'rs Lloyds Ins. Exch.* v. *Trading Co.* (Tex.), 229 S. W. 312.

Defendant's counsel concede that under those decisions plaintiff may proceed in a single chancery suit to secure a decree for the aggregate liability of the subscribers, and to fix the separate liability of each

subscriber, but contend that they are not authority for an action at law against the combined membership of the co-insurers.

Neither the object or result of this action was to fix the separate liability of each subscriber nor even an indirect adjudication by which any subscriber might be obligated beyond his proportionate share in viola-tion of his contract of insurance. The object was to establish the amount and liability of the voluntary association upon a policy issued by the combined authority of members under its adopted name. As a matter of substantive law these subscribers by their cooperative contracts of insurance operated a method of writing insurance under an adopted name whereby their combined proportionate liability aggregated the amount of loss an insured would be entitled to under the terms of his policy. The method of enforcing that liability so long as each subscriber is not holden in excess of his individual proportionate liability is in principle but a procedural matter over which the legis-lature of each State has control within the constitu-tional limit against impairing the validity of con-tracts.

In the *Lewelling Case* a similar statute authorizing individuals, partnerships and corporations to exchange reciprocal or inter-insurance contracts with each other likewise required consent in writing executed by the attorney for subscribers to be filed with the com-missioner of insurance, authorizing service of process upon the commissioner in all suits in the State arising out of their policies, contracts or agreements which should be valid and binding on all subscribers ex-changing reciprocal insurance through such attorney. Of this the court there said:

"It is true that the act does not, in express terms, provide that suit shall be brought against the associa-tion under its associated name; but such is, we think, the effect of the statute when all its parts are read

in the light of each other. It would be a vain and idle thing to provide that service of process should be had upon the insurance commissioner in all suits in this State arising out of such policies and contracts, and that such service should be valid and binding upon all subscribers exchanging at any time reciprocal or inter-insurance contracts through the attorney in fact if the plaintiffs had to resort to the common-law method of procedure as to the parties to the suit."

In the *Mountain Timber Co. Case,* an action said to be prosecuted on the theory that it was one in equity, a trial was had upon the merits resulting in a finding and award in favor of plaintiff followed by an ordinary judgment against the association, by name, for the amount found due, leaving undetermined the sum to be contributed towards its payment by the several members of the association. Although it appears the policy there sued upon limited right of recovery to actions against its members, the court held plaintiff might rightfully maintain the action and defendant's contention that the trial court could not lawfully render a judgment against defendant in the form shown was unavailing.

*Warfield-Pratt-Howell Co.* v. *Williamson, supra,* shown by the statement of facts closely analogous to the instant case in many particulars, was a suit in equity begun by bill of complaint filed in the circuit court of Cook county, Illinois, resulting in a decree in plaintiff's favor from which defendant appealed. Upon the question of remedies the supreme court of that State said:

"Plaintiffs in error (defendants) seek to maintain the proposition that since the relation of the parties, as well as the relief sought, is purely legal, equity has no jurisdiction. Defendant in error (plaintiff) seeks to uphold the jurisdiction of equity on the ground that the case falls within the exclusive jurisdiction of a court of equity. Neither of these contentions is sound. In our opinion the case belongs to that class

where both the primary rights and the relief sought are purely legal and therefore cognizable in a court of law, but of which a court of equity will take jurisdiction on the ground that, owing to the methods of procedure and the means available to carry its decrees into execution, its remedies are more adequate, complete and prompt than those afforded by a court of law. * * * There is nothing in the character of the rights or in the ultimate relief sought that distinguishes this case from any other claim under an insurance policy for loss. It would be a very unusual state of facts if one holding a fire insurance policy could not maintain an action at law thereon to recover for a loss. We see no reason for holding that the policies involved in this suit might not be sued on in a court of law. It does not follow, however, that because the case is one in which a remedy at law is afforded, equity will not also take jurisdiction of the same state of facts to afford the same redress."

Under the law and facts presented by this record we are of opinion that plaintiff's primary rights are purely legal, and under the fair intendment of our statute an action at law against defendant in the associate character and name by which it contracted will lie.

Upon the question of apportionment, as to which plaintiff appealed, we are furnished with elaborate briefs by both sides with numerous citations and extensive discussions of various methods of apportionment followed in different States, the merits of which need not be reviewed in detail as we think defendant's policies are Illinois contracts to be construed under the laws of that State. They are blanket policies containing in each an apportionment clause as follows:

"The subscribers shall not be liable in the aggregate under this policy for a greater proportion of any loss on the described property, or for loss by and expense of removal from the premises endangered by fire, than the amount hereby insured shall bear to the whole insurance, whether valid or not, or by solvent or insolvent insurers, covering such property, and

the extent of the application of the insurance under this policy or of the contribution to be made by the subscribers in case the loss may be provided for by agreement or condition written hereon or attached or appended hereto."

Until shortly before the fire the old line policies were also blanket policies with like contribution clauses, when a Michigan standard *pro rata* rider was attached to them without defendant's consent or knowledge, as claimed, reading as follows:

"It is hereby agreed that at all times this policy shall attach in or on each building, division or location in such proportion as the value in or on each building, division or location bears to the aggregate value of the subjects insured."

Plaintiff contends that the effect of this was to break up the old line blanket policies "into as many parts as there were buildings, divisions or locations, and insured each for an amount proportional to the value of that building, division or location, as related to the value of all the property covered by the policies," so that in reaching an apportionment the old line policies "should all be considered as though they had been written for that amount, on the portion of the plant destroyed, which the value therein bore to the total value insured," which would result in a proportionate computation placing the additional amount plaintiff claims on defendant's policies.

The contribution clause in each of the old line policies yet provided that the insurer would pay of the loss on the whole property described in it the proportion that the face of the policy bears to the entire amount of insurance on the property described, which is, at least inferentially, at variance with the *pro rata* or average provision in the attached rider.

While the authorities are not in harmony as to just how such a situation should be met, treating this policy as an Illinois contract we think the trial court

under the facts shown rightly held in substance that on the face of and as to defendant's policies the other insurance should likewise be regarded as concurrent.

In *Royall* v. *Insurance Co.*, 158 Ill. App. 463, a similar question in principle arose. The American Central Insurance Company had a blanket policy of all the insured's property, partially destroyed by fire, and the Hartford Fire Insurance Company had a policy describing and covering the same property but divided amongst the three buildings composing the same in proportion to value, in an average clause resembling the rider attached to the old line policies in the instant case. The policies of both companies were for the same amount and both contained a contribution clause providing:

"This company shall not be liable under this policy for a greater proportion of any loss on the described property   *   *   *   than the amount hereby insured shall bear to the whole insurance, whether valid or not, or by solvent or insolvent insurers, covering such property."

The American Central Insurance Company paid one-half of the loss, but the Hartford company declined to do so, contending it was only liable for its proportion of the loss as computed on the basis of its average clause. The trial court held that each company should pay one-half the loss. This was affirmed by the appellate court, as it appeared that the policies of both companies contained like descriptive and contribution clauses, which is the situation in the instant case, the court construing "the amount hereby insured" as meaning in the connection used the whole amount of insurance covered by the policy, and "the whole insurance" as the total of both policies.

In *Kansas City Paper Box Co.* v. *Insurance Co.*, 100 Mo. App. 691 (75 S. W. 186), a similar condition

arose involving the effect of an average or *pro rata* clause in one policy upon the contribution clause in another, which the court disposed of as follows:

"The contention made by plaintiff is that the *pro rata* clause, above set out, which it permitted ten of the companies (not including defendant) to attach to their policies providing for a mode of adjustment and of ascertainment of loss in each building, should be considered in ascertaining the proportion of payment which should be made by this defendant. But we are wholly unable to understand why its additional qualifying contract with other insurance companies, made without defendant's concurrence or knowledge, ought to have any influence on defendant's contract. There can be no more reason for allowing plaintiff's contention than there would have been had it entered into a contract with those other companies, in any other respect, changing their relation to the property insured or their liability in case of loss. The defendant can only be dealt with by the courts under the terms of its own contract."

We are of opinion that upon this record defendant is to be dealt with by the court under the terms of its own contracts.

The judgment will stand affirmed. Both parties having appealed, taxable costs will be divided, except that each will pay for printing its own briefs.

WIEST, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred. FELLOWS, C. J., did not sit.

The late Justice STONE took no part in this decision.